IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

BFC GAS COMPANY L.C. AND
BFC ELECTRIC COMPANY L.C.,

        Plaintiffs,

vs.

GYPSUM SUPPLY CO. d/b/a
GYPSUM SUPPLY CO. OF CEDAR
RAPIDS,

        Defendant.

No. C13-0081

ORDER FOR SANCTIONS

---

## TABLE OF CONTENTS

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  **PRIOR ORDERS REGARDING DISCOVERY** . . . . . . . . . . . . . . . . . 3

IV.  **BFC'S DISCOVERY FAILURES** . . . . . . . . . . . . . . . . . . . . . . . 4
    A.    *Gypsum's First Motion to Compel* . . . . . . . . . . . . . . . . . . . . . 4
    B.    *Gypsum's Second Motion to Compel* . . . . . . . . . . . . . . . . . . . 7
    C.    *Gypsum's First Motion for Sanctions* . . . . . . . . . . . . . . . . . . 9
    D.    *Gypsum's Second Motion for Sanctions* . . . . . . . . . . . . . . . . 10

V.   **MISREPRESENTATIONS AT MAY 27, 2014 HEARING** . . . . . . . . . . 11
    A.    *Seizure of Documents by Federal Authorities* . . . . . . . . . . . . . . 11
    B.    *Efforts to Retrieve and Produce Seized Documents* . . . . . . . . . . . 12
    C.    *Litigation Hold* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    D.    *Property Insurance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    E.    *Collins Community Credit Union* . . . . . . . . . . . . . . . . . . . . 18
    F.    *Other Misrepresentations* . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.  DISCUSSION ............................................... 20
     A.   Attorney Fees and Expenses Previously Ordered ............. 21
     B.   Discovery Expenses Following May 27, 2014 Hearing ......... 23
     C.   Rule 11 Sanctions .................................... 24
     D.   Summary ............................................ 30

VII. ORDER ................................................... 30

## I. INTRODUCTION

On the 4th day of November 2014, this matter came on for hearing on the Second Motion for Sanctions (docket number 39) filed by the Defendant on August 28, 2014. The Defendant was represented by its attorney, Philip A. Burian. Plaintiffs did not appear, nor anyone for them.[1]

## II. PROCEDURAL HISTORY

On July 31, 2013, Plaintiffs BFC Gas Co., L.C. and BFC Electric Co., L.C. (collectively "BFC") filed a petition in the Iowa District Court for Linn County, seeking damages sustained to its facility during a storm on May 19, 2013. BFC claimed the

---

[1] Seven minutes prior to the hearing, my judicial assistant received a telephone call from Plaintiffs' attorney, Mark A. Critelli, who stated he would be appearing at the hearing telephonically. I considered Critelli's statement to be an oral motion to appear telephonically, which I denied. Critelli was advised that the hearing would proceed in his absence. On the following day, November 5, Critelli filed a "Follow Up Response to Resistance to Motion for Summary Response and Sanctions" (docket number 49). Plaintiffs did not seek permission to file an additional brief, and it has been disregarded by the Court.

The Court also notes that the hearing on Gypsum's first motion for sanctions (May 27, 2014) was delayed for one hour because BFC's attorney, Kathryn Barnhill, called earlier in the morning and asked that she be permitted to appear telephonically. The request was denied and the hearing was delayed while Barnhill drove from Des Moines to Cedar Rapids.

damages were caused by the negligence of Defendant Gypsum Supply Co. ("Gypsum") or, alternatively, that liability was established by *res ipsa loquitur*. The action was removed to this Court on August 15, 2013 and Gypsum filed a reply on August 22.

On November 14, 2013, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. The case was then set for trial before Chief Judge Linda R. Reade on December 15, 2014. Gypsum subsequently filed a motion for summary judgment, however, which was granted by Chief Judge Reade on October 15, 2014. Judgment was entered in favor of Gypsum and against BFC. BFC has now appealed.

Meanwhile, on August 28, 2014, Gypsum filed the instant Second Motion for Sanctions (docket number 39). BFC filed a Resistance (docket number 40) on September 4, and Gypsum filed a Reply (docket number 41) on September 5.

### III. PRIOR ORDERS REGARDING DISCOVERY

On January 3, 2014, Gypsum filed its first Motion to Compel (docket number 10). BFC did not file any response. The motion was granted on January 22, and BFC was given until January 30 to produce the requested documents. *See* docket number 14.

On February 27, 2014, Gypsum filed a Second Motion to Compel (docket number 15). Again, BFC did not file any response. On March 18, the Court granted the second motion to compel and ordered BFC to produce the requested documents not later than March 28. *See* docket number 18.

On April 28, 2014, Gypsum filed a Motion for Sanctions (docket number 20). Once again, BFC did not file any response. Nonetheless, the Court set the motion for hearing. Following the hearing on May 27, the Court denied Gypsum's request to dismiss the action as a discovery sanction. However, the Court found Gypsum was entitled to "reasonable expenses, including attorney's fees, caused by BFC's failure to comply with its discovery obligations and the Court's Orders." *See* Order Regarding Motion for

Sanctions (docket number 24) at 10. The Court directed the parties to meet and confer in an effort to agree on the appropriate expenses and attorney fees. If the parties were unable to reach an agreement, then the Court authorized Gypsum to file a supplemental application.

In the instant second motion for sanctions, Gypsum asks the Court to establish the amount of attorney fees ordered by the Court following Gypsum's first motion for sanctions. Gypsum also asks that additional monetary sanctions be imposed against BFC's counsel as a consequence of multiple misrepresentations made at the May 27 hearing. Finally, Gypsum asks that it be awarded all of its attorney fees in this case, pursuant to FEDERAL RULE OF CIVIL PROCEDURE 11.

## IV. BFC'S DISCOVERY FAILURES

### A. Gypsum's First Motion to Compel

This case was brought in state court on July 31, 2013 and removed to this Court on August 15. On November 14, 2013, the Court adopted the proposed Scheduling Order and Discovery Plan submitted by the parties. Among other things, the Court established deadlines for discovery. Specifically, the parties were required to provide their RULE 26(a) initial disclosures not later than November 26, 2013.

BFC's failure to provide required discovery, and failure to comply with the Court's orders, began immediately. When BFC failed to provide its initial disclosures by the November 26 deadline, Gypsum's attorney (Philip Burian) sent an email on December 4 to BFC's attorney (Kathryn Barnhill), asking about the initial disclosures and suggesting that a motion to compel would be filed if the disclosures were not received by December 10.[2] Barnhill responded the next day, stating that "I was thinking I had filed them some

---

[2] Email from Philip A. Burian to Kathryn Barnhill, dated December 4, 2013, Exhibit D-1 to Defendant's Motion to Compel (docket number 10-14).

time ago." Burian replied, noting the difference between the RULE 7.1 Disclosure Statement and the initial disclosures required under RULE 26(a)(1).

In the early afternoon on December 10, another Gypsum attorney (Jeffrey Rosencrants) called Barnhill "as a final courtesy" prior to filing a motion to compel. Barnhill told Rosencrants that "she had just started working on [BFC's initial disclosures] and asked for a duplicate copy of [Gypsum's] Initial Disclosures," which had been timely served on November 26. Rosencrants followed up with an email confirming the conversation and noted "it is rather clear that we will not receive a satisfactory response today."[3] Ms. Barnhill responded within the hour as follows:

> My initial Disclosures are very simple. Yes, I just started them. You will have all there is to have. If that is not sufficient, you will need to file whatever you think appropriate.

Email from Kathryn Barnhill to Jeffery Rosencrants, dated December 10, 2013, Exhibit E-3 to Defendant's Motion to Compel (docket number 10-5).

Later on December 10, Barnhill sent an initial disclosure claiming $2,750,000 in damages and identifying just two witnesses. Also attached were 166 pages of documentation regarding insurance coverage effective as of August 13, 2013 — two months *after* the May 19, 2013 storm. In fact, Burian notes in his declaration filed in support of the first motion to compel that Barnhill "now has sent those same 166 documents on three separate occasions."[4]

Still later in the afternoon on December 10, Burian responded to Barnhill acknowledging receipt of BFC's initial disclosures, but noting various defects. Burian also

---

[3] Email from Jeffery Rosencrants to Kathryn Barnhill, dated December 10, 2013, Exhibit E-3 to Defendant's Motion to Compel (docket number 10-5).

[4] Declaration of Philip Burian at 4, ¶ 15 (docket number 10-1).

expressed concern that ESI (electronically stored information) "may either have been lost or will otherwise not be produced." Counsel had previously exchanged emails regarding the production of ESI. On November 7, 2013, Burian sent Barnhill an email regarding the proposed scheduling order and discovery plan, and specifically addressed initial disclosures and ESI. In an email on November 13, Burian referred to a discussion which Barnhill had with Rosencrants, in which Barnhill stated that she "did not think the BFC entities would have any ESI at all." Burian observed "that is not what I would have expected in this email age but I do not have a good handle on how and the extent to which BFC actually operates."[5] Barnhill responded the next day, stating "[w]ell if email are electronic discovery then I better rethink and ask — I'll get back to you."[6] Barnhill responded further to Burian's email on December 10, stating that "[u]pon checking yet again, there is no ESI. There simply is none. All communications were by phone."[7]

Meanwhile, Gypsum served BFC with its first set of requests for production of documents and first set of interrogatories.[8] BFC did not timely respond to the written discovery requests. In his email to Barnhill on December 4, 2013, Burian advised Barnhill

---

[5] Email from Philip A. Burian to Kathryn Barnhill, dated November 13, 2013, Exhibit C-1 to Defendant's Motion to Compel (docket number 10-4).

[6] Email from Kathryn Barnhill to Philip A. Burian, dated November 14, 2013, Exhibit C-1 to Defendant's Motion to Compel (docket number 10-3).

[7] Email from Kathryn Barnhill to Philip Burian, dated December 10, 2013, Exhibit G-4 to Defendant's Motion to Compel (docket number 10-7).

[8] It is unclear whether the discovery requests were served on August 16, 2013 or September 16, 2013. The discovery requests bear a proof of service stamp certifying that the documents were served on August 16. *See* docket numbers 10-2 and 10-3. In his declaration filed in support of the first motion to compel, however, Burian states that the requests for production and interrogatories were served on September 16. *See* Declaration of Philip Burian at 1, ¶ 4 (docket number 10-1).

to consider December 17 "as a firm deadline for responding to the previously served interrogatories and requests for production of documents."[9] Barnhill responded to the written discovery on December 17, and transmitted 17 emails with various attachments. Gypsum subsequently received a CD containing operating and maintenance logs.

On December 23, Gypsum served additional requests for production, and Burian sent Barnhill an email identifying defects in BFC's earlier responses.[10] In response, Barnhill for the third time sent the same 166 pages of insurance documents which became effective *after* the loss, but did not provide insurance documents in force at the time of the loss. Following a site inspection on January 2, 2014, and Barnhill's comments that "she would provide the documents when her schedule allowed," Gypsum filed its first motion to compel.

Gypsum filed its first motion to compel on January 3, 2014. BFC did not file any response to the motion. On January 22, 2014, the Court granted Gypsum's motion to compel and directed BFC to produce the requested discovery not later than January 30. BFC was advised that if it failed to fully comply with the Court's Order, "then they may be subject to appropriate sanctions upon further application by Defendant."[11]

## B. Gypsum's Second Motion to Compel

On February 27, 2014, Gypsum filed a second motion to compel. Gypsum claimed (1) BFC had not complied with the Court's first Order Compelling Discovery, (2) Gypsum had learned of additional discovery rule violations by BFC that were not known at the time

---

[9] Email from Philip A. Burian to Kathryn Barnhill, dated December 4, 2013, Exhibit D-1 to Defendant's Motion to Compel (docket number 10-14).

[10] Email from Philip A. Burian to Kathryn Barnhill, dated December 23, 2013, Exhibit G-1 to Defendant's Motion to Compel (docket number 10-7).

[11] *See* Order Compelling Discovery (docket number 14).

of the first motion to compel, and (3) BFC had not complied with additional discovery obligations since Gypsum's first motion to compel. The "primary issues" raised in Gypsum's second motion to compel involved the identification, preservation, and production of discoverable documents, including ESI, the failure to provide a qualified and prepared witness under FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6), and BFC's ongoing failure to comply with the Court's first Order Compelling Discovery. The motion specifically enumerated those documents being sought by Gypsum.

In its brief in support of the second motion to compel and supporting documents, Gypsum challenged Barnhill's earlier representation that "[u]pon checking yet again, there is no ESI. There simply is none." Gypsum noted that BFC's plant manager testified that BFC managers and others regularly conducted business by email. Another BFC agent testified that she had "looked through emails" to determine if she was included on requested communications regarding the storm damage. In addition, BFC management communicated through text messages. In short, it is clear that BFC did not investigate, preserve, or produce relevant ESI.

Gypsum also asserted that BFC did not preserve and produce "hard copy documents," such as log books. Some log book information was provided. According to Gypsum, "[a]ttentive examination of the log, however, revealed that the page that would have covered May 19 [the day of the storm] was torn out of the book." Photographs attached as exhibits support the allegation.[12]

Gypsum also complained of BFC's production of Brian Wink, BFC's plant manager, as a RULE 30(b)(6) witness. Wink's deposition was taken on February 13, 2014. In its brief filed in support of its second motion to compel, Gypsum asserts:

---

[12] *See* photos, Exhibits Z-1, Z-2, AA-1, AA-2, and BB attached to Gypsum's Second Motion to Compel (docket numbers 15-15, 15-16, and 15-17).

> Mr. Wink had not prepared to any extent whatsoever for the deposition. He was never shown the list of subjects for examination prior to his deposition starting. He was not even aware that BFC previously produced interrogatory answers. At one point, Mr. Wink stated "I think you got the wrong person in here for a lot of these questions because I'm not going to know a lot of these" subjects on the deposition notice.

Gypsum's Brief in Support of Second Motion to Compel (docket number 15-1) at 8 (internal citations to the deposition omitted).

Gypsum filed its second motion to compel on February 27, 2014. Among other things, Gypsum asked that it be awarded attorney fees and costs. Exhibit DD attached to the motion itemizes the costs associated with BFC's discovery failures at $9,373.[13] Once again, BFC made no response to Gypsum's second motion to compel. On March 18, 2014, the Court granted the second motion to compel and ordered Plaintiffs to produce the requested documents, and a qualified RULE 30(b)(6) witness, not later than March 28, 2014. The Court did not award attorney fees at that time, but BFC was told that if it failed to fully comply with the Order, "then they may be subject to appropriate sanctions upon further application by Defendant."[14]

## C. *Gypsum's First Motion for Sanctions*

On April 28, 2014, Gypsum filed its first motion for sanctions. Gypsum claimed that BFC had not complied with the Court's two separate Orders Compelling Discovery and had yet to identify, preserve, and produce discoverable documents, including ESI. In seeking sanctions, Gypsum also asserted that "BFC [was] continuing to prosecute allegations that it admits are demonstrably false." In its supporting brief, Gypsum details BFC's failure to identify, preserve, and produce ESI. Gypsum also complains that BFC

---

[13] *See* docket number 15-19.

[14] *See* Order Granting Second Motion to Compel (docket number 18).

had failed to produce missing parts of the logbook. The brief also describes in considerable detail what Gypsum describes as "known false and frivolous allegations." As a discovery sanction, Gypsum asked that the case be dismissed. Gypsum also asked for attorney fees as a discovery sanction and for BFC's violation of RULE 11.

Following a familiar pattern, BFC made no response to Gypsum's motion for sanctions, notwithstanding the fact that Gypsum was seeking dismissal of the action. Nonetheless, the Court set the matter for hearing on May 27, 2014. The responses made by Barnhill at the hearing will be discussed in more detail below.

On May 30, 2014, the Court filed its Order granting the motion for sanctions in part, and denying it in part. I found that "[t]he record establishes that BFC has been dilatory in complying with its discovery obligations."[15] Among other things, I noted that it was not until two days after I filed the first Order Compelling Discovery that "BFC notified [Gypsum] for the first time that most of its records were seized by federal authorities some time earlier."[16] In addition, I found that BFC's document production was incomplete and the witness identified for RULE 30(b)(6) purposes "was not knowledgeable regarding all of the subjects identified in the notice of deposition." Nonetheless, I rejected Gypsum's call to dismiss the action as a discovery sanction. Instead, I concluded that Gypsum "is entitled to reasonable expenses, including attorney's fees, caused by BFC's failure to comply with its discovery obligations and the Court's Orders."[17]

### D. Gypsum's Second Motion for Sanctions

On July 29, 2014 — after I denied Gypsum's request to dismiss the action as a discovery sanction — Gypsum filed a motion for summary judgment. On August 28, 2014

---

[15] *See* Order Regarding Motion for Sanctions (docket number 24) at 8.

[16] *Id.* at 9.

[17] *Id.* at 10.

— while the motion for summary judgment was pending — Gypsum filed the instant second motion for sanctions. This time, BFC filed a four-page resistance, together with a memo from BFC's attorney (Mark A. Critelli) to Burian, apparently prepared on July 22, 2014.[18] The resistance notes that "[o]n May 29, 2014, the Iowa Supreme Court entered an Order suspending the license of Kathryn Barnhill for 60 days." Interestingly, Critelli asserts in the resistance that "[d]uring part of the period of her suspension, Mrs. Barnhill worked for Mr. Critelli in the capacity of a lay assistant."[19] The resistance makes no effort to respond to the detailed allegations made by Gypsum regarding material misrepresentations allegedly made by Barnhill at the May 27, 2014 hearing.

## V. MISREPRESENTATIONS AT MAY 27, 2014 HEARING

Gypsum complains that BFC's attorney, Kathryn Barnhill, made numerous false statements at the May 27, 2014 sanctions hearing, thereby causing additional effort and expense by Gypsum's attorneys.

### A. Seizure of Documents by Federal Authorities

For example, Barnhill told the Court at the hearing that BFC's failure to produce certain documents was caused by the seizure of the documents by federal authorities. Specifically, Barnhill claimed at the hearing that relevant documents were seized by federal authorities before the petition was filed in state court.

> THE COURT: When were these items seized by the US Attorney's Office?
> MS. BARNHILL: In the summer of 2013.
> THE COURT: All right. When was your lawsuit filed?
> MS. BARNHILL: Later, in the early fall of 2013.
> THE COURT: So these — well, these events occurred in May of 2013?

---

[18] See docket number 40.

[19] BFC's Resistance (docket number 40) at 3, ¶ 14.

| | |
|---|---|
| MS. BARNHILL: | The incident with the damage to my client's alternative energy plant occurred around 11, 11:30, May 19th of 2013. |
| THE COURT: | So you're saying after the incident occurred and before the lawsuit was filed, I think, about two months later, that these items were seized by the US Attorney? |
| MS. BARNHILL: | Physically seized in a raid, yes, sir. |

Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 4:11-5:2.

The truth is the documents were not seized until October 3, 2013, more than two months *after* the petition was filed.[20] Moreover, on August 16, 2013, Gypsum served BFC with its First Set of Requests for Production of Documents and its First Set of Interrogatories.[21] BFC responded to the written discovery requests on December 17, 2013. Inexplicably, no reference is made to the seizure of documents by federal authorities, or — as Barnhill now claims — that BFC's compliance with discovery demands was hampered by the seizure of its records by federal authorities.

### B. *Efforts to Retrieve and Produce Seized Documents*

At the May 27, 2014 sanctions hearing, the Court asked Ms. Barnhill what efforts had been made to retrieve the seized documents.

| | |
|---|---|
| THE COURT: | When — these items apparently were seized sometime between May and July of 2013. When did you first request copies of them? |
| MS. BARNHILL: | As soon as I realized that Mr. Burian was looking for them. |

---

[20] *See* letter from Assistant United States Attorney Jacob A. Schunk to Jeffrey K. Rosencrants, dated July 10, 2014, attached to the instant motion as Exhibit YY (docket number 39-5).

[21] Copies of the discovery requests are attached to BFC's First Motion to Compel (docket number 10).

| THE COURT: | When did you first ask for copies of them? |
|---|---|
| MS. BARNHILL: | When he asked in discovery for copies of them, but I am not at this moment able to recollect that date. |
| THE COURT: | Well, was it a month ago? |
| MS. BARNHILL: | Oh, no. It was in the fall. |
| THE COURT: | All right. And you just got them from the US Attorney's Office? |
| MS. BARNHILL: | Yes, sir. |
| THE COURT: | So if we had someone from the US Attorney's Office in here, they would confirm that you requested copies of these items last fall and they just produced them? |
| MS. BARNHILL: | Mr. Williams would so testify, yes, sir. |

Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 5:23-6:18.

The truth is the documents were still in BFC's possession when Barnhill should have "realized that Mr. Burian was looking for them." That is, Gypsum served its first set of requests for production of documents and its first set of interrogatories on either August 16 or September 16 — *before* federal authorities executed a search warrant on October 3. Barnhill's statement that she first asked for copies of the documents "in the fall" is also grossly inaccurate. Barnhill's first effort to contact C.J. Williams at the United States Attorneys Office was on January 23, 2014 — the day *after* the Court filed its first Order Compelling Discovery.[22] Barnhill further advised the Court that she had "just received"

---

[22] *See* letter from Assistant United States Attorney Jacob A. Schunk to Jeffrey K. Rosencrants, dated July 10, 2014, attached to the instant motion as Exhibit 44 (docket number 39-5).

the requested documents.[23] The truth is Barnhill received the documents from the U.S. Attorneys Office on February 21, 2014 — 95 days prior to the hearing.[24]

At the sanctions hearing on May 27, I stated that I did not "want to go through each of these [disputed discovery] items one by one," but I specifically asked Barnhill if certain communications requested by Gypsum had been produced. Barnhill responded that "[h]ere again, those were among the records that were seized. I was not able to access them until just recently. So, no."[25] The truth, as discussed above, is that copies of the seized items were returned by the U.S. Attorneys Office on about February 21, 2014. Furthermore, it appears that copies of the emails would have been available to BFC even if they were "seized" by federal authorities.[26]

## C. Litigation Hold

Gypsum also asserts that Barnhill attempted to mislead the Court regarding her obligation to place a "litigation hold" on relevant documents. On May 29, 2013 — just ten days after the storm — Barnhill wrote to Gypsum and suggested that it turn BFC's claim over to Gypsum's insurance company.[27] On July 15, 2013, Barnhill wrote Gypsum again and attached a petition which would be filed in state court unless Gypsum took

---

[23] Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 5:10.

[24] *See* Defendant's Exhibits XX and YY.

[25] Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 17:11-13.

[26] *See* email exchange on January 28, 2014, attached to Gypsum's Second Motion to Compel as Exhibit 7 (docket number 15-14).

[27] Gypsum's Exhibit LLL (docket number 39-17).

immediate action to repair or reimburse BFC for its storm damages.[28] At the hearing on May 27, 2014, Barnhill admitted she did not instruct her client to preserve any documents.[29] Later in the hearing, Barnhill tendered the following explanation for her failure to initiate a litigation hold:

| | |
|---|---|
| MS. BARNHILL: | May I just address the ESI one brief moment? |
| THE COURT: | Sure. |
| MS. BARNHILL: | It occurred to me that the ESI was accomplished by means of the federal raid and then preserving everything on every computer and every file, and that is why I didn't give a specific direction to preserve ESI, because I believed it was being preserved. |
| THE COURT: | Is that the explanation you gave to Mr. Burian? |
| MS. BARNHILL: | Yes, sir. |
| THE COURT: | Because I got the impression from his motion that it wasn't being preserved because you didn't believe it had to be preserved and you didn't tell anyone at the company to preserve it. |
| MS. BARNHILL: | That's not correct, Your Honor. Mr. Burian and I have had many, many conversations, many of which he has now taken a completely opposite position. But, no, I told him that the electronic copies were in the hands of the Feds and I was working diligently to get them. |

Transcript Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 44:24-45:19.

---

[28] Gypsum's Exhibit JJJ (docket number 39-16).

[29] Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 3:6-22.

Barnhill's explanation makes no sense. The obligation to preserve documents relating to the claim attached not later than her demand letter of May 29, 2013. The petition was filed in state court on July 31. Gypsum served its request for production of documents on August 16 or September 16. Federal authorities did not execute their search warrant until October 3. For Barnhill to now claim that "the ESI was accomplished by means of the federal raid" and "that is why I didn't give a specific direction to preserve ESI" simply makes no sense. The "raid" occurred more than four months after the obligation to preserve documents attached.

Moreover, there is no evidence that Barnhill previously gave that explanation to Burian, and the Court notes she did not offer the explanation at the hearing when the Court initially asked her whether she had instructed her client to preserve documents. Instead, it appears to be a feeble excuse — and a nonsensical one at that — which popped into Barnhill's head toward the end of the hearing. It should be recalled that on December 10, 2013 — two months *after* the federal search warrant — Barnhill told Burian in an email that "[u]pon checking yet again, there is no ESI. There simply is none. All communications were by phone." That email is wholly inconsistent with the story which Barnhill came up with at the hearing.

### D. Property Insurance

Barnhill also misled the Court at the May 27 hearing when asked about BFC's property insurance. I asked Barnhill about Gypsum's claim that BFC had failed to provide copies of communications to its insurance carrier regarding the storm damage. Barnhill claimed that she had "provided the insurance policies as requested," but BFC had not communicated with its insurance carrier.

|                |                                          |
|----------------|------------------------------------------|
| THE COURT:     | BFC, did it have property damage insurance? |
| MS. BARNHILL:  | It did.                                  |
| THE COURT      | Did it submit a claim?                   |

| | |
|---|---|
| MS. BARNHILL: | The property damage was more than the deductible. It did not submit a claim. |
| THE COURT: | The deductible was more than the damage, you mean? |
| MS. BARNHILL: | Yes, I think so. |
| THE COURT: | Well, how much is BFC claiming in damages? |
| MS. BARNHILL: | Repair for the cooling towers. |
| THE COURT: | How much? |
| MS. BARNHILL: | I think around 200,000. |
| THE COURT: | How much was their deductible? |
| MS. BARNHILL: | 200,000. |
| THE COURT: | So it never submitted a claim to its own insurance company? |
| MS. BARNHILL: | Correct. |

Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 18:20-19:13.

The truth is BFC had no insurance at the time of the loss. As previously noted, Barnhill repeatedly provided Gypsum with documents relating to insurance coverage which went into effect on August 13 — more than two months *after* the loss. Following the May 27 hearing, Gypsum sought information from BFC's insurance agent regarding coverage. On May 29, the insurance agent sent an email to one of BFC's principals, stating he would not respond to Gypsum's attorney's request, but noting that "[a]s you are aware, we did not have coverage placed for BFC/Permeate until August 13, 2013."[30] Gypsum had been attempting for months to obtain documents regarding any insurance which would have been in effect at the time of the loss nearly one year earlier. Burian repeatedly told Barnhill that the documents produced by BFC did not cover the relevant time frame. It is inconceivable to me that Barnhill did not know the true facts regarding insurance when she responded to my questions at the May 27 hearing.

---

[30] Gypsum's Exhibit UU (docket number 32-5).

### E. *Collins Community Credit Union*

Barnhill also falsely answered the Court's questions regarding an effort to discover documents pertaining to Collins Community Credit Union ("CCCU"). Barnhill claimed she had made a diligent search for the documents, and that none existed.

| | |
|---|---|
| THE COURT: | "Correspondence with Collins Community Credit Unit [*sic*] and other mortgage or lienholders other than Collins Community Credit Union that reference property values and/or the storm damage." |
| MS. BARNHILL: | There is none. |
| THE COURT: | All right. So you can say that you've made a diligent search for that, and none exists? |
| MS. BARNHILL: | Yes. |
| THE COURT: | All right. And I'm going to require that in writing, so that if it turns out later on through a subpoena with Collins Community Credit Union that there was such communication and that no effort was made to find that by contacting Collins, then, you know, you're going to have a real problem on your hands. |

Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 17:23-18:11.

The truth is it does not appear that Barnhill made a diligent search for the requested documents. After the May 27 hearing, Gypsum subpoenaed CCCU for relevant documents. On July 24, CCCU responded with documents which would have been responsive to Gypsum's earlier document request. In addition, the declaration of Sandra Vaughan, senior vice-president at Collins Community Credit Union, stated she did not locate "any documents or information" indicating that either Barnhill or any other representative of BFC contacted the Credit Union "to inquire about whether CCCU has documents or communications regarding BFC property values in connection with the above

litigation or regarding damage to the BFC facility caused by a May 19, 2013 storm."[31] Moreover, several of the communications produced by CCCU were emails in which Barnhill was copied. That is, Barnhill should have been familiar with the relevant documents even if she failed to contact CCCU directly.

### F. Other Misrepresentations

In its brief, Gypsum also refers to other false statements made by Barnhill at the May 27 hearing. For example, Barnhill told the Court that the tax depreciation schedules had been produced. Burian responded that "I strongly disagree." On May 29 — two days after the hearing — Burian sent Barnhill an email listing the documents which had been produced.[32] According to Gypsum's brief, neither Barnhill nor Critelli have ever claimed that the list "is not accurate and complete." Gypsum asserts the tax depreciation schedules are not listed "because they have never been produced."[33]

Regarding a request for communications with Alliant Energy, I asked Barnhill at the May 27 hearing whether her clients had any communications with Alliant Energy. Barnhill responded "no" and stated her clients would be able to say so under oath.[34] In fact, one of BFC's principals communicated by email to Alliant Energy on May 23 — four days after the storm — with a copy of the email sent to Barnhill.[35]

In its brief, Gypsum details its allegations regarding misrepresentations made by Barnhill at the May 27 hearing. Gypsum also states that "[t]he foregoing assertions are

---

[31] Declaration of Sandra Vaughan, Exhibit III (docket number 39-15).

[32] Gypsum's Exhibit KK (docket number 30-4).

[33] Gypsum's Brief (docket number 39-1) at 10.

[34] Transcript of Hearing on Motion for Sanctions (Defendant's Exhibit AAA), 21:3-9.

[35] Gypsum's Exhibit QQQ (docket number 39-23).

not made lightly and the undersigned will be pleased to stand corrected wherever necessary if any of them are credibly explained."[36] In its four-page resistance to the second motion for sanctions, BFC makes no effort to credibly rebut any of the allegations. As noted above, BFC's counsel (Critelli) failed to appear at the hearing on the instant second motion for sanctions.[37]

## VI. DISCUSSION

Gypsum's instant second motion for sanctions is in three parts. First, Gypsum asks the Court to assess the reasonable expenses, including attorney's fees, ordered by the Court in response to Gypsum's first motion for sanctions. Second, Gypsum asks the Court to award attorney fees and expenses for discovery violations which occurred after the Court's first Order, particularly in view of Barnhill's multiple misrepresentations at the first hearing. Third, Gypsum asks the Court to award all of its attorney fees as a sanction pursuant to FEDERAL RULE OF CIVIL PROCEDURE 11. Altogether, Gypsum seeks judgment in the amount of $102,722.35.

Preliminarily, I believe I have jurisdiction to rule on both the RULE 37 request for sanctions and the RULE 11 request for sanctions. Because these are nondispositive issues, a magistrate judge has jurisdiction to hear and determine these matters pursuant to 28 U.S.C. § 636(b)(1)(A). *See Temple v. WISAP USA*, 152 F.R.D. 591, 596 (D. Neb. 1993). If it is determined that I do not have jurisdiction to enter judgment as a discovery sanction or as a sanction under RULE 11, then this Order may be considered a report and recommendation, pursuant to § 636(b)(1)(B). In either event, my decision is subject to

---

[36] Gypsum's Brief (docket number 39-1) at 12.

[37] Even *if* the Court were to consider the "Follow Up Response to Resistance to Motion for Summary Response and Sanctions" filed by BFC's attorney on the day after the hearing, it does not address these issues.

review by the district court. The only distinction is whether the review would be on a "clearly erroneous or contrary to law" standard, or whether it would be a *de novo* review.

## A. *Attorney Fees and Expenses Previously Ordered*

As detailed above, BFC repeatedly failed to provide appropriate discovery. The Court filed its first Order Compelling Discovery on January 22, 2014, and its second Order Compelling Discovery on March 18. Gypsum then filed its first motion for sanctions. Following a hearing on May 27, the Court found that Gypsum was entitled to "reasonable expenses, including attorney's fees, caused by BFC's failure to comply with its discovery obligation and the Court's Orders." The Court directed the parties to meet and confer in an effort to agree on the appropriate amount, but authorized Gypsum to file a supplemental application if no agreement could be reached. Gypsum now asks the Court to assess the amount previously ordered.

FEDERAL RULE OF CIVIL PROCEDURE 37(a)(5) provides that if a motion to compel is granted, "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." However, expenses and fees will not be ordered if the movant failed to attempt to resolve the issue in good faith, the opposing party's nondisclosure was "substantially justified," or "other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A). The Court did not order attorney fees in response to Gypsum's first motion to compel or Gypsum's second motion to compel. When BFC failed to comply with the Court's Orders, however, Gypsum filed its first motion for sanctions, and the Court ordered attorney fees at that time. *See* FED. R. CIV. P. 37(b)(2)(C) (In addition to other sanctions, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses,

including attorney's fees caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.").

Attached to Gypsum's first motion for sanctions, as Exhibit SSS, is a four-page itemization prepared by Gypsum describing "unnecessary fees for discovery."[38] The itemization identifies fees incurred for (1) ESI matters, (2) initial disclosures, (3) first motion to compel, (4) duplicate document production, (5) second motion to compel, and (6) post 2/26/14 discovery efforts and motions. The identified attorney fees total $12,969. In responding to the instant second motion for sanctions, neither BFC nor Barnhill challenge the number of hours incurred by Gypsum regarding discovery matters, nor do they challenge the hourly rate being charged. That is, BFC and Burian make no claim that the amount sought by Gypsum is unreasonable.

As discussed in greater detail above, Gypsum made multiple attempts to obtain the requested discovery. Gypsum's efforts were made more difficult by Barnhill's inattention and incompetence. It appears that Barnhill was unaware of the requirement to make initial disclosures under RULE 26(a), was unaware of her obligation to instruct BFC to preserve ESI, or even knew what ESI is, and was unaware of the appropriate requirements of RULE 30(b)(6). She either knew that some of BFC's records were seized in October 2013 and failed to alert Gypsum of that fact or, perhaps worse, was clueless as to the whereabouts of her client's records. In either event, she failed to notify Gypsum of the situation, or attempt to retrieve the documents until after the Court had already entered its first Order Compelling Discovery. On other occasions, BFC dumped documents on Gypsum without making any effort to determine if they were responsive to a discovery request or had been previously provided. As noted above, Barnhill sent Burian 166 pages

---

[38] *See* docket number 39-25.

of documents relating to insurance coverage three times — when Burian repeatedly told Barnhill that they did not apply to the time of the loss.

As a consequence of BFC's failure to meet its discovery obligations and comply with the Court's Orders, Gypsum was required to incur substantial additional expense. BFC's and Barnhill's failures were not "substantially justified" and there are no other circumstances which would make an award of expenses "unjust." Accordingly, the Court concludes that BFC and Barnhill should be ordered to pay Gypsum attorney fees relating to the first motion for sanctions in the amount of $12,576.[39]

### B. Discovery Expenses Following May 27, 2014 Hearing

On May 27, 2014, the Court held a hearing on Gypsum's first motion for sanctions. Barnhill appeared at that time and responded to questions from the Court regarding the status of discovery. In partial reliance on those answers, the Court declined to recommend to Chief Judge Reade that the case be dismissed due to BFC's failure to comply with its discovery obligations. As detailed above, however, many of the representations made by Barnhill to the Court on May 27 were simply not true. As a consequence, it was necessary for Gypsum to incur additional expense and chase down the true facts.

This is not the first time that Barnhill has attempted to mislead the Court. In *Barnhill v. Iowa Dist. Court for Polk County*, 765 N.W.2d 267 (Iowa 2009), the Court details Barnhill's actions while representing Jerry's Homes in an action to recover damages against Tamko Roofing Prods., Inc. In sanctioning Barnhill $25,000, the trial court wrote that "[i]t is as though Barnhill said whatever needed to be said at each step to just get past the moment, whether there was a legitimate basis for saying it or not." *Id.* at 271-72. The Iowa Supreme Court found there was "substantial evidence supporting a $25,000

---

[39] In its itemization attached to the first motion for sanctions (Exhibit SSS), Gypsum places the total at $12,969. In Exhibit TTT filed in support of its second motion for sanctions, the attorney fees are set at $12,576. *See* docket number 47-1.

sanction," and noted that "the district court was frustrated with Barnhill's trial tactics and lack of candor and forthrightness, both of which led to the extension of the proceedings and increased legal expenses incurred by Humphreys." *Id.* at 277, 278. Similarly, Barnhill's responses to my questions at the sanctions hearing on May 27 were wildly inaccurate. If Barnhill did not know the answer to a question, she could have simply said so. Instead, she provided the Court and Gypsum with false information.

Because Barnhill falsely answered questions at the May 27 hearing, it was necessary for Gypsum to incur additional expense to uncover the truth. In Exhibit TTT, Gypsum places that additional expense at $18,365. Neither BFC nor Barnhill challenge the number of hours incurred by Gypsum's attorneys, or the hourly rate. The Court finds that judgment should enter against Barnhill personally in the amount of $18,365.

### C. Rule 11 Sanctions

Finally, Gypsum asks the Court to order BFC and Barnhill to pay all of its attorney fees and expenses, pursuant to FEDERAL RULE OF CIVIL PROCEDURE 11. Rule 11(b) requires an attorney who presents a pleading, written motion, or other paper to the Court to certify that the factual contentions have evidentiary support and the claims are warranted by existing law or by a nonfrivolous argument for extending existing law. If the Court determines that RULE 11(b) has been violated, then the Court may impose an appropriate sanction on the attorney or party that violated the RULE. *See* RULE 11(c)(1).

On October 15, 2014, Chief Judge Linda R. Reade granted Gypsum's motion for summary judgment and dismissed BFC's petition. *See* Order (docket number 44). While Judge Reade summarily dismissed BFC's claims, however, it does not necessarily follow that sanctions are appropriate under RULE 11. Judge Reade specifically held the case open with respect to Gypsum's second motion for sanctions. Accordingly, it remains to be determined whether Gypsum is entitled to all of its attorney fees and expenses as a sanction under RULE 11.

"[T]he central purpose of RULE 11 is to deter baseless filings in district court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). In considering a RULE 11 claim for sanctions, the Court must consider the factual and legal basis for the complaint, as well as the appropriate sanction.

> Determining whether an attorney has violated RULE 11 involves a consideration of three types of issues. The court must consider factual questions regarding the nature of the attorney's prefiling inquiry and the factual basis of the pleading or other paper. Legal issues are raised in considering whether a pleading is "warranted by existing law or a good faith argument" for change in the law and whether the attorney's conduct violated RULE 11. Finally, the district court must exercise its discretion to tailor an "appropriate sanction."

*Cooter & Gell*, 496 U.S. at 399. "Although the Rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy, any interpretation must give effect to the Rule's central goal of deterrence. *Id.* at 393.

The gravamen of BFC's complaint was that parts of Gypsum's building blew off during a storm on May 19, 2013, damaging parts of BFC's building. In its petition filed on July 31, 2013, BFC's "general allegations" included the following:

> 4. On or about May 19, 2013 parts of the Defendant's facility hit the Plaintiffs' facility causing substantial damage to the Plaintiffs' facility. This was an isolated incident involving only Gypsum Supply Co. of Cedar Rapids, Iowa.
>
> 5. Parts of BFC's facility did not blow off.
>
> 6. No other structures or buildings in the immediate area were damaged nor did parts fly off of other buildings or structures in the immediate area nor did other damage to other buildings occur in the immediate area.

Plaintiffs' Petition (docket number 2) at 1, ¶¶ 4-6.

These allegations are simply not true. There is no evidence that parts of Gypsum's building hit BFC's building. It was not an isolated incident involving only Gypsum. Parts of BFC's building *did* blow off. The damage from the storm was widespread, including damage to other buildings in the immediate area.

Even the most basic investigation would have revealed wide-spread damage caused by the May 19 storm. It was extensively covered in the media.[40] Chief Judge Reade described the storm damage in her Order granting Gypsum's motion for summary judgment as follows:

> The storm inflicted damage throughout Linn County. Alliant Energy reported that 48,000 customers lost electrical service. Within the two-mile radius of Defendant's facility, there were fifty-four insurance claims for property damage attributable to the storm. Among the many commercial buildings damaged were hangars at the Eastern Iowa Airport. The Cedar Rapids Gazette's ColorWeb facility, a commercial structure about 800 feet to the south of Defendant, suffered storm damage similar to some of Plaintiffs' damage. The pattern of storm damage created a line that tracked the unusual south to north direction that directly intersected Plaintiffs' and Defendant's properties. This line of damage is consistent with an even more severe form of storm wind called a microburst, which would have imposed even greater wind speeds in the immediate area than the wind speeds measured by instruments at the Eastern Iowa Airport.

Order (docket number 44) at 17.

BFC's RULE 30(b)(6) witness, Brian Wink, was unable to identify any investigation conducted by anyone from BFC before claiming that this was an isolated incident involving only Gypsum, with no significant damage to other buildings in the immediate area. In fact, Wink admitted at his deposition that he had personal knowledge that this was not an

---

[40] *See* Michael Panoske Declaration (docket number 20-6).

isolated incident.[41] Wink also admitted that parts of BFC's building had blown off in the storm.[42] Moreover, Chief Judge Reade found that there was no evidence any debris from Gypsum's buildings caused any damage to BFC's buildings.

> The physical evidence shows that the only cause of damage to Defendant's and Plaintiffs' buildings was the wind interference effect on the structures. There is no evidence that debris from Defendant, airborne or otherwise, actually caused any significant damage to Plaintiffs' structures.

Order (docket number 44) at 18.

In its resistance to the instant second motion for sanctions, BFC briefly addresses its discovery shortcomings, particularly those which occurred after Barnhill was suspended on May 30. BFC and Barnhill made no effort, however, to respond to Gypsum's claim that the action was frivolous from the outset and sanctions were appropriate under RULE 11. It should be recalled that Gypsum also sought relief under RULE 11 in its first motion for sanctions filed on April 28, 2014. Neither BFC nor Barnhill even filed a response to the first motion for sanctions.

BFC's petition was initially filed in the Iowa District Court for Linn County and was subsequently removed to this court. Accordingly, it is unclear whether Gypsum's claim for sanctions should be considered under Iowa Rule of Civil Procedure 1.413(1) or FEDERAL RULE OF CIVIL PROCEDURE 11. Most courts have held, however, that RULE 11 is applicable because "[o]nce removed, the plaintiff is impressed with a continuing responsibility to review and reevaluate his pleadings and where appropriate modify them to conform to RULE 11." *Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 335-36 (6th Cir. 1988).

---

[41] Deposition of Brian Wink (docket number 15-3), 175:20-24.

[42] *Id.*, 106:8-18.

By signing and filing the petition, and continuing to pursue the action after it was removed to federal court, Barnhill certified to the Court "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support . . . ." FED. R. CIV. P. 11(b)(3). I believe that such certification was false. There is no evidence that BFC or Barnhill made "an inquiry reasonable under the circumstances" before filing the petition. Any reasonable investigation would have revealed that this was not "an isolated incident involving only Gypsum Supply Co. of Cedar Rapids, Iowa," or that no other damage occurred to other buildings in the immediate area. BFC and Barnhill brought the action without any proof that BFC's buildings were damaged by flying debris from Gypsum's buildings, let alone that Gypsum was somehow negligent.

If the Court determines that RULE 11(b) has been violated, "the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED. R. CIV. P. 11(c)(1). "A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." RULE 11(c)(4).

Barnhill has been sanctioned for pursuing frivolous actions in the past. Barnhill was sanctioned in *Barnhill v. Iowa Dist. Court for Polk County* for numerous violations of Iowa Rule of Civil Procedure 1.413, the state court equivalent of federal RULE 11. In *Everly v. Knoxville Community School Dist.*, 774 N.W.2d 488 (Iowa 2009), the district court awarded the defendant all of its attorney fees ($47,403.87), as a sanction against Barnhill. *Id.* at 492. On appeal, the Iowa Supreme Court found that Barnhill was properly sanctioned for certain behavior, but sanctions were not appropriate for other behavior. Accordingly, the case was remanded for further proceedings to determine the appropriate amount of sanctions to be awarded. *Id.* at 495-96. In *Barnhill v. Iowa Dist. Court*, 797 N.W.2d 621 (Iowa App. 2011) (Table), 2011 WL 222531, the Iowa Court of Appeals

found that the district court did not abuse its discretion in finding Barnhill violated Iowa Rule of Civil Procedure 1.413(1). *Id.* at *9. The Court found the district court properly ordered attorney fees in the amount of $7,142.68, but lacked authority to order an additional $5,000 in sanctions payable directly to the Court. On May 30, 2014 — three days after the sanctions hearing in this case — the Iowa Supreme Court suspended Barnhill's license to practice law for 60 days.[43] *See Iowa Supreme Court Attorney Disciplinary Bd. v. Barnhill,* 847 N.W.2d 466 (Iowa 2014).

After considering all of the facts and circumstances, the Court concludes that in addition to the discovery sanctions imposed above, BFC and Barnhill should be required to pay a monetary sanction in the amount of $20,000 for a violation of FEDERAL RULE OF CIVIL PROCEDURE 11. The Court recognizes that this is far less than the total expenses reasonably occurred by Gypsum in defending this frivolous lawsuit.

---

[43] The Court notes parenthetically that Barnhill was working "in the capacity of a lay assistant" during the period she was suspended from the practice of law by the Iowa Supreme Court. In the resistance to the instant motion, BFC's attorney (Mark A. Critelli) states that "[d]uring part of the period of her suspension, Mrs. Barnhill worked for Mr. Critelli in the capacity of a lay assistant." Plaintiffs' Resistance to Motion to Compel and for Sanctions (docket number 40) at 3, ¶ 14. This can be seen in an email exchange which occurred on July 2, 2014. Gypsum's attorney (Philip A. Burian) received an email from "Admin Assistant" at the Critelli law firm. In the second email, "Admin Assistant" refers to "documents referenced in a letter dated June 20, 2014 and sent to Ms. Barnhill on page 3, item #5." After a couple of emails are exchanged, Mr. Critelli wrote "I confirm that 'Admin Assistant' is Kathryn; with the 12:20 message being written in the third-person, that was not readily apparent." An hour later, Critelli wrote that "at the present time K. Barnhill is working under my direction and not as an attorney." *See* Exhibit EEE (docket number 39-11).

### D. Summary

In my Ruling on Gypsum's first motion for sanctions, I found that Gypsum was entitled to reasonable expenses, including attorney's fees, caused by BFC's failure to comply with its discovery obligations and the Court's Orders. I now assess those reasonable expenses in the amount of $12,576. Judgment will enter against BFC and Barnhill jointly. In addition, I award as a discovery sanction the reasonable expenses incurred by Gypsum following the May 27, 2014 sanctions hearing. I find the reasonable expenses, including attorney's fees, are in the amount of $18,365. Because the expenses were incurred largely as a consequence of Barnhill's misrepresentations at the sanctions hearing, the Court finds that judgment should enter against Barnhill solely. Finally, I find that this action was brought without any reasonable inquiry to determine whether the factual and legal contentions had evidentiary support. As a consequence of this frivolous action, Gypsum has incurred attorney fees in excess of $100,000. After considering all of the facts and circumstances, I find that BFC and Barnhill should jointly pay $20,000 in a RULE 11 sanction.

### VII. ORDER

IT IS THEREFORE ORDERED that the Second Motion for Sanctions (docket number 39) filed by the Defendant is **GRANTED** as follows:

1. Pursuant to the Court's Ruling on the first Motion for Sanctions, judgment shall now enter in favor of Gypsum Supply Co. and against BFC Gas Company L.C., BFC Electric Company L.C., and Kathryn S. Barnhill, jointly and severally, in the amount of Twelve Thousand Five Hundred Seventy-Six Dollars ($12,576.).

2. As a sanction for discovery violations made at the first hearing on motion for sanctions and afterward, judgment shall now enter in favor of Gypsum Supply Co. and against Kathryn S. Barnhill, individually, in the amount of Eighteen Thousand Three Hundred Sixty-Five Dollars ($18,365).

3.     As a sanction for violation of FEDERAL RULE OF CIVIL PROCEDURE 11, judgment shall enter in favor of Gypsum Supply Co. and against BFC Gas Company L.C., BFC Electric Company L.C., and Kathryn S. Barnhill, jointly and severally, in the amount of Twenty Thousand Dollars ($20,000).

DATED this _5th_ day of January, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA